UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-CR-583-SEITZ

UNITED STATES OF AMERICA,
     Plaintiff,
v.

SALVADOR MAGLUTA,
     Defendant.
_____/

## MOTION FOR COMPASSIONATE RELEASE

Salvador Magluta, through counsel, respectfully moves this Court to reduce Mr. Magluta's term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A), and in support states the following.

Mr. Magluta is a 66-year-old man who has spent much of the last 25 years in solitary confinement, locked alone in a tiny, cement cell about half the size of a parking space. Despite his minimal disciplinary history throughout his time in prison, Mr. Magluta has been confined to this country's highest security facility, the supermaximum prison at ADX Florence, for more than ten years. From his cell, he has access to only a sliver of sunlight through a small window, and he is allowed an hour and a half per day out of his cell—during which he is permitted to spend time in a slightly larger "recreational" area. He has been deprived of almost all forms of environmental stimulation and social interaction over these years, slowly descending into a debilitated state and struggling against worsening mental illness with an ever more tenuous grip on reality. He has recently begun to exhibit symptoms of dementia.

Over these years, Mr. Magluta's medical condition has also severely deteriorated. Such deleterious health outcomes are not surprising for someone who has spent extended periods in solitary confinement, as Mr. Magluta has. Decades of research have documented the catastrophic psychological and physical harms of subjecting human beings to prolonged periods of solitary confinement. But the recent, rapid decline of Mr. Magluta's physical and mental health now makes his continued confinement inhumane and excessive. Further, Mr. Magluta's medical conditions—which include chronic kidney disease and Type 2 diabetes mellitus, among several others outlined below—place him in the highest risk category for developing serious illness or dying were he to contract Covid-19. Unfortunately, this is much more likely while he is incarcerated, even at a facility like ADX Florence, than if he were released to home confinement.

As explained below, given the realities of life in an isolation unit like ADX and routine close proximity to guards, he remains highly vulnerable to exposure there.

In 2006, on resentencing after appeal, Mr. Magluta received a sentence from this Court of 195 years—effectively, a life sentence.   DE:3019.   But Mr. Magluta was *not* sentenced by this Court to spend the remainder of his years in such a damaged state and incarcerated in such inhumane conditions.   Nor was he sentenced to die under circumstances like this: in a global pandemic that is spreading much more rapidly in correctional facilities than elsewhere in the community, and where he cannot receive adequate medical and mental health care.   Given Mr. Magluta's declining medical and mental health condition, and in light of the severe health risks that he continues to face if he remains incarcerated, Mr. Magluta respectfully moves this Court to reduce his term of imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), and to impose instead a life sentence of home confinement.

## I.    Procedural and Factual Background

In 2002, Mr. Magluta was convicted after trial of one count of conspiracy to commit offenses (obstruction of justice and violation of a restraining order) against the United States, in violation of 18 U.S.C. § 371; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); two counts of obstruction of justice (witness bribery and jury bribery), in violation of 18 U.S.C. § 1503; and eight counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(I). DE:2696. In January 2003, the Court sentenced him to 205 years in prison.   *Id*.

At the time he was convicted, Mr. Magluta had already spent a total of more than five years in solitary confinement in BOP facilities in and near Miami, while awaiting trial on this case and his prior case.   PSI ¶ 251 at 70–71; Def. Sentencing Exhibits (DE:2661), at 83.   Since then, the restrictive nature of his incarceration, including years of uninterrupted confinement in solitary conditions, has only become more extreme.   After he was sentenced and designated within the BOP system, Mr. Magluta began a harrowing journey through the isolation and "control" units of various BOP facilities throughout the country that continues even today.

In 2003, after spending some months in solitary confinement at USP Beaumont, Mr. Magluta was transferred to USP Marion, which at that time was operating as a federal supermaximum security prison.   He remained at USP Marion, in total solitary confinement, for about three years. DE:3026, at 52.   In 2006, when USP Marion was renovated and re-designated as a medium security prison, Mr. Magluta was transferred to ADX Florence, a newer facility that had been specifically designed as the country's highest supermaximum security facility.   *Id*.

2

Today, ADX is BOP's most restrictive facility, built to house inmates considered too dangerous for maximum security prisons, such as foreign and domestic terrorists; its conditions are so brutal that a former warden has infamously described the facility as a "clean version of hell."[1]

Mr. Magluta remained at ADX Florence in solitary confinement from 2006 through 2010 when, as a result of a civil settlement with the BOP that challenged his confinement in such extended isolation,[2] he was moved first to USP Florence, in the same complex as the ADX building, until being transferred to USP Terre Haute, in Indiana.   However, in 2013, shortly after an incident where two cell phones were found in a shared cell, Mr. Magluta was transferred back to ADX Florence, and he has remained there ever since.[3]   In total, Mr. Magluta has spent *more than 20* of his years in prison in solitary confinement, in total and utter isolation—locked in a kind of prison within a prison. Significantly, Mr. Magluta has remained housed at ADX Florence over recent years despite his designation within BOP as an individual who suffers from "serious mental illness."[4]   As his medical records show, Mr. Magluta has received multiple mental health diagnoses during his time in BOP custody, including major depressive disorder, posttraumatic stress disorder, anxiety state, and panic disorder.[5]   Due to the extraordinarily harsh conditions of extreme isolation such as that practiced at ADX, the BOP is not typically permitted to house mentally ill inmates there, for safety and health reasons.[6]   However, the BOP has continued to

---

[1]   Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times Magazine (Mar. 26, 2015), https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

[2]   This case was litigated as *Magluta v. BOP*, 08-cv-404 (D. Colo.).

[3]   Mr. Magluta's facility transfer history is outlined in *Magluta v. Daniels, et al.*, 15-cv-2203, Fourth Amended Complaint, DE:87, (D. Colo. Jan. 17, 2017).

[4]   *See* BOP Extraordinary Security Concerns Review, attached as Exhibit E.

[5]   Bureau of Prisons ("BOP") Records, at 42, 53, 57–58.   These medical records will be filed separately under seal.

[6]   *See* BOP Program Statement 5310.16, at 19.   Such policies have developed through extensive litigation on behalf of mentally ill inmates at ADX.   *See, e.g.*, *Cunningham v. Bureau of Prisons*, 12-cv-01570-RPM (D. Colo.). Indeed, as the plaintiffs alleged in *Cunningham*, even before that lawsuit was filed, BOP's policies stated that men with serious mental illnesses should not be designated to ADX, recognizing that "extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health, and can be particularly harmful for men who had mental health problems before being confined in such conditions."   Second Amended Complaint (June 15, 2015), ECF No. 274, at ¶ 3.
Documents filed in *Cunningham* outline the "horrible consequences" of BOP's failure to adhere to its policies and provide adequate care to mentally ill inmates at ADX.   Specifically: "Many prisoners at ADX interminably wailed, screamed, and banged on the walls of their cells. Some mutilated their bodies with razors, shards of glass, sharpened chicken bones, writing utensils,

waive that precaution in Mr. Magluta's case, finding "extraordinary security concerns" to justify his continued placement there.[7]

Today, Mr. Magluta is a 66-year-old man with numerous, severe medical issues far exceeding most men of his years.   As documented in the most recently available records provided to him by the BOP, Mr. Magluta suffers from kidney failure and Stage 3 chronic kidney disease, Type 2 diabetes mellitus, hypertension, hypothyroidism, hyperlipidemia, dysmetabolic syndrome x (a cluster of metabolic abnormalities), obesity, ulcerative colitis (an autoimmune disease causing inflammation in the digestive tract), preglaucoma, pulpal necrosis and periapical abscess (types of dental and gum disease), temporomandibular joint disorder, dyspepsia, and major depressive disorder.   Bureau of Prisons ("BOP") Medical Records, at 96–97.[8]   In July of 2019, his treating physician at BOP noted that Mr. Magluta showed an "insidiously deteriorated mental state over the last four years" that was "chronically worsening," and that he had begun to exhibit "dementia-like symptoms."   In one disturbing incident in March 2019, for example, Mr. Magluta was observed by a guard to be "placing bags of medicine into his mouth."   BOP Medical Records, at 101–04.   As a representative example of the type of medical care he receives at ADX, in response to this incident, Mr. Magluta was shackled by guards into "hard ambulatory restraints" and placed on suicide watch.   *Id.*

Last year, on the referral of the BOP physician and in light of concerns regarding his "insidiously deteriorated mental state," Mr. Magluta underwent an MRI brain scan to explore

---

and whatever other objects they could obtain.   A number swallowed razor blades, nail clippers, parts of radios and televisions, broken glass, and other dangerous objects.   Others carried on delusional conversations with voices they heard in their heads, oblivious to reality and to the danger that such behavior might pose to themselves and anyone who interacts with them.   Still others spread feces and other human waste and body fluids throughout their cells, threw it at the correctional staff, and otherwise created health hazards at ADX. Suicide attempts were common; many have been successful."   *Id.* at ¶ 5.

[7] The BOP has cited various bases for its "concerns" regarding Mr. Magluta over the years, ranging from "safety and security to staff," "risk for escape," "history of circumventing visiting and telephone regulations," "extensive contacts in the community," "position of leadership in a criminal organization," and "length of . . . sentence." *See* BOP Extraordinary Security Concerns Review, attached as Exhibit E.

[8] Unfortunately, BOP has not provided counsel *any* medical records, despite repeated requests for such records.   However, Mr. Magluta has provided counsel some records from the last several years.   To assist in the Court's review, the undersigned submits copies of records sent to counsel through Mr. Magluta.   However, as requested below, to the extent that more recent records or the full set of medical records would be helpful for the Court's review, the undersigned respectfully requests that the Court order BOP to produce these records.

concerns of "cerebral vascular disease" or other "organic causes" of his "chronically worsening mental state."   BOP Medical Records, at 116.

However, Mr. Magluta has not been provided any medical records documenting the results of the MRI examination—which took place in July 2019—or indeed, any medical records from this point onward.   Further, the BOP has not fulfilled any of the multiple attempts by both Mr. Magluta and counsel to retrieve these more recent records.[9]   Thus, the results of his MRI brain scan, and the degree to which his condition has worsened over the past year since that examination, remain out of reach of counsel.   To the extent that these additional, more recent records would assist the Court in its review of this case, the undersigned respectfully requests that the Court order the BOP to produce the full set of Mr. Magluta's medical records for review, or at least his medical records from July 2019 onwards.   In any case, what is abundantly clear even now is that Mr. Magluta is currently in a state of rapidly declining physical and mental health.

At the time that Mr. Magluta was first sentenced by this Court in 2003, some of these health conditions were already present.   He had managed depression and anxiety disorders throughout his adulthood, and he was being treated for ulcerative colitis.   PSI ¶¶ 237-39, 243-250. However, the accelerated decline in his mental state over the past several years, and the increasingly severe medical conditions with which he has more recently been diagnosed, seem to be a direct result of the acute stress caused by decades of his extended isolation.   Prolonged solitary confinement "inevitably impose[s] significant psychological pain," causing "severe exacerbation of [] previously existing medical condition[s]," "physical disease," and even "death."[10]   Because the brain is "literally wired to connect to others," thwarting this process "not only undermines psychological well-being but increases physical morbidity and mortality."[11] Numerous studies performed worldwide over many decades have documented that extended periods of solitary confinement cause alarming rates of "severe psychotic disturbances" among those confined, with many individuals quickly becoming "actively psychotic and/or acutely suicidal."[12]

---

[9]  Until July 2019, when concerns regarding "cerebral vascular disease" began to be noted, Mr. Magluta was regularly provided his medical records upon request.   However, he has not received any medical records since July 2019, despite multiple internal requests.

[10]  Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Policy 325, 329 (2006).

[11]  Craig Haney, *Restricting the Use of Solitary Confinement*, 1 Annual Review of Criminology 285, 286 (2018).

[12]  Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Policy at 349.

Importantly for this case, very few individuals in this country have ever been incarcerated under solitary conditions for periods extending *anywhere near* as long as in Mr. Magluta.   Here's a helpful benchmark: because sensory and social deprivation is so toxic to healthy brain functioning, the U.N.'s Special Rapporteur for Human Rights considers solitary confinement of more than *15 days* a "form of torture."[13]   As explained in a recent U.N. report on the subject, persons subjected to isolation can "quickly become deeply destabilized and debilitated."   *Id*.; *see also Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (explaining that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects") (emphases removed).   Likewise, the U.S. Supreme Court has previously affirmed sentences to punitive isolation of *30 days*, while making clear that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."   *Hutto v. Finney*, 437 U.S. 678, 686 (1978).   And while special housing units are routinely utilized in the U.S. for disciplinary or security measures, most inmates held under such conditions are held there temporarily, as a matter of days, weeks, or months.[14]

More recently, in a concurring opinion examining "the human toll wrought by extended terms of isolation," Justice Kennedy explained that "even for prisoners sentenced to death, solitary confinement bears a further terror," as "years on end of near-total isolation exacts a terrible price." *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring).   In the research cited by Justice Kennedy, extended solitary confinement was found to cause prisoners to fall "into a semi-fatuous condition," become "violently insane," "commit[] suicide," and result in "anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors."   *Id*. at 289.

In total, Mr. Magluta has been confined under solitary conditions for *more than 20 years*. As one district court made clear in a recent case analyzing solitary confinement conditions in at Louisiana's Angola prison, such lengthy confinement in solitary is truly exceptional.   In that

---

[13]   United Nations Commission on Human Rights, Report by Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment (Mar. 20, 2020), U.N. Doc. A/HRC/43/49, https://www.ohchr.org/en/issues/torture/srtorture/pages/srtortureindex.aspx.

[14]   *See* Association of State Correctional Administrators and Yale Law School, *Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms* (Nov. 2016), at 28 (noting that 63% of prisoners in restrictive housing in state and federal prisons were placed there for less than six months, and about 95% for less than six years), *available at* https://law.yale.edu/sites/default/files/area/center/liman/document/aimingtoreducetic.pdf.

case—where the plaintiffs had been in solitary confinement at Angola for "over 30 years"—the court explained that these prisoners "had been in extended lockdown more than anyone in Angola's history, and more than any other living prisoner in the United States." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 685 (M.D. La. 2007). Mr. Magluta's time in solitary confinement is beginning to approach that grim and extraordinary milestone.

And yet the prolonged nature of Mr. Magluta's isolation does not make it any easier to bear. Rather, each added day "exponentially" exacerbates the severe harms caused to Mr. Magluta by this penological practice. The *Wilkerson* court explained it is "a matter of common sense that three decades of extreme social isolation and enforced inactivity in a space smaller than a typical walk-in closet present the antithesis of what is necessary to meet basic human needs. . . . With each passing day its effects are exponentially increased, just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones." 639 F. Supp. 2d at 684.

Further, given the multiple medical conditions from which Mr. Magluta suffers, he is now in the Center for Disease Control and Prevention's *highest* risk category for developing serious illness or dying if he were to contract Covid-19. As outlined by the CDC, people of any age with Type 2 diabetes mellitus, those with chronic kidney disease, and those who suffer from obesity are all at the highest risk for severe illness as a result of the virus.[15] The CDC has also warned that older adults, people with hypertension, and people with neurologic conditions such as dementia may also be at increased risk for severe illness.[16] Studies have shown that the *combination* of these high-risk comorbidities significantly increases the threat Covid-19 poses of severe illness or death.

Indeed, even within the confines of a facility like ADX, Mr. Magluta remains extremely vulnerable to the virus while incarcerated. While he has no regular contact with other inmates, Mr. Magluta is routinely shackled, or worse, by guards at the facility when he is moved from his cell. Shackling a prisoner necessitates very close contact between guards and inmates on an almost daily basis, which makes social distancing impossible. As one correctional medical expert recently explained, "[T]he notion that germs won't spread if people are sealed in individual cells" could not be "farther from the truth," given that "[l]ockdown units often require more staff than

---

[15] CDC, People at Risk for Severe Illness: People of Any Age with Underlying Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html; *see also*

[16] *Id.*; *see also* CDC, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

regular units, because of the need to handcuff and physically escort people to and from the shower, in and out of the cell for health care, and numerous other basic operations."[17]   Thus, any infected correctional officer—who themselves may be pre-symptomatic or asymptomatic, and unaware of their risk of contagion—could easily spread the virus to Mr. Magluta.

As the Court is well aware, as the national situation has rapidly devolved due to the spread of the pandemic, the situation inside of BOP facilities is dire even compared to the broader U.S. While the current rate of infection within the U.S. is about 18 people per 1,000, the rate of infections within the BOP is almost *five times* that number.[18]   As will be described in detail further below, "prisons are like tinderboxes for infectious disease," *U.S. v. Rodriguez*, No. 2:03-CR-00271, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020), and the BOP has repeatedly failed to contain outbreaks of Covid-19 throughout its facilities.

Put simply, Mr. Magluta's physical and mental health have been profoundly damaged by his time in custody.   He has been incarcerated for decades under conditions that are widely considered as "torture" and well-documented in scientific literature to be extremely harmful.   And he faces increasing risks by remaining in custody, both as a result of his vulnerability in this pandemic and as his physical and mental state continues to deteriorate.   While this Court does not decide where Mr. Magluta is placed within the BOP system, it does have power under the First Step Act to *reduce* his time in custody.   Under these unique circumstances, and because continued incarceration is now excessive and inhumane, Mr. Magluta respectfully asks for a sentence reduction, and to serve the remainder of his life term on home confinement.

## II.   The Court Should Reduce Mr. Magluta's Sentence Pursuant to the First Step Act Because Extraordinary and Compelling Reasons Warrant Reduction

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences pursuant to longstanding compassionate release provisions, and judges may grant such requests if "extraordinary and compelling reasons" warrant a reduction.   *See* First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)).   The compassionate release statute provides:

---

[17]   Homer Venters, *Coronavirus behind bars: 4 priorities to save the lives of prisoners*, The Hill (Mar. 23, 2020), *available at* https://thehill.com/opinion/criminal-justice/488802-coronavirus-behind-bars-4-priorities-to-save-the-lives-of-prisoners.
[18]   *See* Federal Defenders of New York, which updates this data daily at: https://federaldefendersny.org.

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction;

*****

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

Thus, a motion under Section 3582(c)(2) should be granted where the Court finds four things: (a) that the defendant has either exhausted his request or waited 30 days since he submitted his request to the warden; (b) that extraordinary and compelling reasons exist; (c) that the defendant's release would not pose a danger to the community; and (d) that release would be consistent with the § 3553(a) factors.

As to the first point, Mr. Magluta first submitted his compassionate-release request to the Warden at ADX on July 1, 2020.[19]   Thus, because 30 days have now passed since his initial request to the Warden, Mr. Magluta has now fully met the time-lapse requirements of the statute. His request to this Court is ripe for review.

As to the remaining points, the Court has the authority to modify Mr. Magluta's sentence because, in light of his deteriorating health conditions, the excessive and brutal nature of his confinement, and the global Covid-19 pandemic, "extraordinary and compelling reasons" are now present to justify a reduction.   Further, Mr. Magluta no longer poses any danger to the community, and the § 3553(a) factors mitigate strongly in favor of reducing his sentence under these extraordinary circumstances.

---

[19]   *See* BOP Compassionate Release Request, attached as Exhibit A.

**A. The Court may reduce Mr. Magluta's term of imprisonment based on its own determination of extraordinary and compelling reasons, which should include the impact of his decades in solitary confinement and the current pandemic.**

This Court has authority to determine that the worsening global pandemic, combined with the risks of continued confinement now directly posed to Mr. Magluta as a result of his deteriorating mental and physical health, now present an extraordinary and compelling basis for a sentence reduction.

As set forth above, sentencing courts have authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). When Congress first created compassionate release in 1984, Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied, and a list of specific examples." 28 U.S.C. § 994(t). The Guideline ultimately issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" in the application notes, and these generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3) advanced age and deteriorating health in combination with the amount of time served; or, (4) compelling family circumstances. U.S.S.G. § 1B1.13 *cmt.* 1(A)–(C). Importantly, however, the commentary also includes a fifth catch-all provision for "extraordinary and compelling reason *other than, or in combination with*, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, *cmt.* 1(D) (emphasis added). The Commission's policy statement also provides that a sentence reduction for "extraordinary and compelling reasons" must be accompanied by a finding by the court that the person is "not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

With the First Step Act of 2018, Congress expanded the use of compassionate release.[20] The First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role in this process. Yet because "the U.S. Sentencing Commission guidance has not yet been updated to reflect the liberalization of the procedural requirements" after Congress passed the First Step Act in 2018, *see U.S. v. Gagne*, 2020 WL 1640152, *2 (D. Conn. Apr. 2, 2020), "[t]here is no policy statement

---

[20] *See* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Sen. Benjamin L. Cardin, co-sponsor of First Step Act) ("The bill expands compassionate release. . . and expedites compassionate release applications.").

applicable to motions for compassionate release filed by defendants under the First Step Act." *U.S. v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. June 28, 2019).

"While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." *Id.*; *see also U.S. v. Bradshaw*, 2019 WL 7605447, *3 (M.D.N.C. Sept. 12, 2019) (noting that "there is no policy statement applicable to a defendant's motion for compassionate release which constrains the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)"); *U.S. v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019) ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582.") (emphasis in original); *U.S. v. Redd*, 444 F. Supp. 3d 717, 724 (E.D. Va. 2020) (§ 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants, and therefore "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"). Courts must therefore make their own determination about whether extraordinary and compelling reasons warrant a sentence reduction.

Courts around the country are now finding that "extraordinary and compelling" reasons include the impact of the global pandemic on vulnerable defendants.   Indeed, since the Covid-19 pandemic, numerous courts in this District, including this Court, have found extraordinary and compelling reasons warranting relief and granting compassionate release. *See, e.g.*, *U.S. v. Gomez*, No. 11-cr-20698-RNS, DE:1420 (Sept 14, 2020); *U.S.. v. Potts*, No. 06-cr-80070-DMM, DE:1341 (Sept. 13, 2020); *U.S. v. Brown*, No. 14-cr-50161, DE:54 (Aug. 31, 2020); *U.S. v. Laing*, No. 18-cr-20731-RNS, DE:66 (Aug. 24, 2020); *U.S. v. Woolley*, No. 19-cr-80093-RLR, DE:111 (Aug. 20, 2020); *U.S. v. Lewis*, 11-CR-20631-PAS (Aug. 20, 2020); *U.S. v. Mendez-Trenches*, No. 08-cr-20767-UU, DE:957 (Aug. 17, 2020); *U.S. v. Martinez*, Case No. 11-cr-20288-DLG, DE:98 (Aug. 17, 2020); *U.S. v. Siegert*, Case No. 13-cr-800009-CMA, DE:53 (Aug. 13, 2020); *U.S. v. Samas Banos*, Case No. 19-cr-20304-CMA, DE:30 (Aug. 13, 2020); *U.S. v. Estepa*, 18-cr-20530-UU, DE:305 (Aug. 10, 2020); *U.S. v. Gonlund Moreno*, 18-cr-20462-MGC, DE:87 (Aug. 10, 2020); *U.S. v. Weems*, 18-cr-60185-BB, DE:187 (Aug. 7, 2020); *U.S. v. Minsal*, 18-cr-20597-UU, DE:46 (Aug. 5, 2020); *U.S. v. Huarte*, 11-cr-20587-RNS, DE:1584 (July 31, 2020); *U.S. v. Israel*, 95-cr-

314-JAL, DE:463 (July 29, 2020); *U.S. v. Joseph*, No. 18-cr-20700-UU, DE:244 (July 29, 2020); *U.S. v. Vazquez-Torres*, 19-cr-20342-BB, DE:58 (July 10, 2020); *U.S. v. Reynolds*, 14-cr-80227-DMM, DE:1427 (July 8, 2020); *U.S. v. Curington*, 12-20115-CR-MGC, DE:645 (July 7, 2020); *U.S. v. Cuchet*, 95-cr-6277-WPD, DE:299 (July 2, 2020); *U.S. v. Firebaugh*, 16-cr-20341-UU, DE:57 (June 22, 2020); *U.S. v. Schumack*, 14-cr-80081-DMM, DE:894 (June 10, 2020); *U.S. v. Chopra*, 18-cr-20668-DMM, DE:607 (June 8, 2020), *U.S. v. Woodson,* 13-cr-20180-CMA, DE:401 (June 4, 2020); *U.S. v. Feucht*, 11-cr-60025-DMM, DE:53 (May 28, 2020); *U.S. v. Shwartz*, 04-cr-20365-MGC, DE:237 (May 20, 2020); *U.S. v. Barcha*, 16-cr-20549-RNS, DE:1498 (May 18, 2020); *U.S. v. Hollander*, 18-cr-80102-RLR, DE:62, 63 (May 14, 2020); *U.S. v. Rico,* 19-cr-20375-DPG, DE:51 (May 14, 2020); *U.S. v. Lima*, 16-cr-20088-RNS, DE:137 (May 11, 2020); *U.S. v. Slavkovic*, 16-cr-20171-UU, DE:1311 (May 8, 2020), 16-cr-20703-DPG, DE:31 (May 11, 2020); *U.S. v. Barbuto,* 18-cr-80122-DMM, DE:314 (Apr. 28, 2020); *U.S. v. Suarez*, No. 18-cr-20175-MGC, DE:180 (Apr. 20, 2020); *U.S. v. Platten*, No. 08-cr-80148-DMM (Apr. 17, 2020); *U.S. v. Minor,* No. 18-cr-80152-DMM, DE:35 (Apr. 17, 2020); *U.S. v. Oreste*, No. 14-cr-20349-RNS, ECF. No. 200 (Apr. 6, 2020); *U.S. v. Bartolo Hernandez*, No. 16-cr-20091-KMW, DE:561 (Apr. 3, 2020); *U.S. v. Dalia Hernandez*, No. 18-cr-20474-CMA, DE:42 (Apr. 2, 2020). Further, these decisions granting compassionate release are by no means limited to the Southern District of Florida.   Hundreds of courts nationwide have found the same.[21]

Importantly, this list of local cases granting compassionate release includes cases where the defendant was serving a life sentence.   Put differently, several courts in this district, including this Court, have determined that even defendants who were sentenced to life in prison *were not sentenced to die under the conditions now present in many BOP facilities nationwide*—in a worsening global pandemic and without access to adequate care.   *See U.S. v. Jaen*, 91-cr-814-FAM, DE:505 (S.D. Fla. July 6, 2020) (reducing life sentence to time served for 81-year old convicted of 600-lb cocaine distribution and assault on federal officer); *U.S. v. Rice*, 90-cr-0768-PAS, DE:421 (S.D. Fla. June 8, 2020) (reducing life sentence to time served for defendant convicted of drug, weapon, and assault charges); *U.S. v. Sanchez*, No. 95-CR-00421-MGC, DE:290 (S.D. Fla. Apr. 27, 2020) (granting compassionate release; reducing life sentence to time served); *U.S. v. Hope*, No. 90-cr-06108-KMW, D.E. 479 (S.D. Fla. Apr. 10, 2020) (granting compassionate release; reducing life sentence to time served).

---

[21] *See, e.g.*, the many cases cited in nn.58-60.

Nationwide, there are many additional recent grants of compassionate release for individuals serving effective or actual life sentences.  *See, e.g.*, *U.S. v. Rice*, Case No. 1:03-cr-441 (D.D.C. July 8, 2020) (reducing life sentence to approximately 16.5 years); *U.S. v. Jenkins*, No. 4:93-cr-11 (W.D. Mich. June 12, 2020) (reducing life sentence based on age and multiple health conditions); *U.S. v. Naranjo*, No. 93-cr-418 (D.D.C. May 11, 2020) (granting compassionate release reducing life sentence to time served due to age and health conditions placing him at risk for COVID); *U.S. v. Smith*, 6:04-cr-2002 (N.D. Iowa July 10, 2020) (reducing mandatory life sentence to time served based on health conditions and COVID after serving approximately 16 years of sentence); *U.S. v. Rodriguez-Barron*, Case No. 2:94-cr-00559-GW (C.D. Cal. Jul. 9, 2020) (reducing then mandatory life sentence based on health conditions and COVID); *U.S. v. Barron*, 2:94-559-GW, Dkt. 424 (C.D. Cal. Jul. 10, 2020) (reducing life sentence based on age and health conditions); *U.S. v. Parker*, Case No. 2:98-cr-00749-CAS-1, 2020 WL 2572525, at *14 (C.D. Cal. May 21, 2020) (reducing life sentence to approximately 22 years, time served for 65-year-old defendant experiencing deteriorating health and particularly susceptible to COVID-19 due to several conditions resulting from the aging process); *U.S. v. Barrenechea*, Case No. 92-cr-00403-MMC-3, 2020 WL 2315638, at *1 (N.D. Cal. May 7, 2020) (granting compassionate release and reducing life sentence for defendant with increased risk of illness from COVID-19); *U.S. v. Williams*, No. 3:04-cr-00095-MCR-CJK, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (granting compassionate release of defendant who served 15 years of life sentence to aging prisoner with medical issues making him vulnerable to COVID-19); *U.S. v. Smith*, 2020 WL 2844222 (N.D. Iowa June 1, 2020) (reducing life sentence based on lung cancer and other medical conditions); *U.S. v. Kubinski*, No. 3:93-cr-28 (E.D.N.C. May 13, 2020) (reducing life sentence based on age and deterioration in physical health); *U.S. v. Perez*, No. 6:88-cr-10094 (D. Kan. March 11, 2020) (reducing life sentence based on age and rehabilitation); *U.S. v. Curtis*, No. 03-cr-533, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (granting compassionate release to a 43-year-old defendant who had served 17 years of life sentence for sex trafficking children based on his advanced MS, Covid-19, and changes to the career-offender guideline); *U.S. v. Plunk*, No. 94-cr-36-TMB (D. Alaska Apr. 9, 2020) (granting compassionate release to prisoner serving two life sentences for drug offenses based on medical conditions and vulnerability to the Covid-19 pandemic due to age); *U.S. v. Regas*, No. 391CR00057MMDNA1, 2020 WL 2926457, at *4 (D. Nev. June 3, 2020) (reducing life sentence due to age and vulnerability to COVID-19); *U.S. v. Ledezma-Rodriguez*, No. 3:00-cr-71 (S.D. Iowa July 14, 2020) (reducing life sentencing and

finding that sentencing disparity combined with rehabilitation, Covid-19, and a dependent family member justified release).

Indeed, this list of recent sentence reductions under compassionate release includes individuals like Mr. Magluta who were considered to be, at one time, leaders of large drug organizations. *See, e.g.*, *U.S. v. Bernard*, DE:1811, 97-cr-48-RNC (D. Conn. Aug. 4, 2020) (granting compassionate release and reducing 405-month sentence to time served for defendant who was the "head of the Latin Kings in Connecticut" and the "lead defendant in a large RICO conspiracy case" involving that group, when defendant was 57 years old and "at 'high risk' of serious illness or death were he to contract COVID-19"); *U.S. v. Fisher*, 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) (granting compassionate release to former "drug kingpin" convicted of a "sprawling narcotics conspiracy" who committed "heinous crimes" and "stole away the lives of others," and reducing life without parole sentence to time served); *U.S. v. Diego Rodriguez*, No. 00-CR-761-2-JSR, 2020 WL 5810161, at *1 (S.D.N.Y. Sept. 30, 2020) (granting compassionate release and reducing life sentence to 30 years for defendant convicted of racketeering, drug trafficking, and the "brutal murder of a government informant").

**B. Mr. Magluta's deteriorating medical and mental health due to decades in solitary confinement is an extraordinary and compelling reason for a reduction in sentence.**

Solitary confinement has long been held to be an especially brutal form of punishment, with scientific research showing deleterious and long-term health impacts on those subjected to it even for short periods.   And the isolation units at ADX Florence comprise perhaps some of this country's most notorious and harrowing examples of this penological practice.   Unfortunately, these findings have now been personally borne out by Mr. Magluta, a 66-year-old man whose medical and mental health condition is rapidly declining after decades in isolation.   While BOP's administrative decisions regarding Mr. Magluta's placement in any particular correctional facility or unit may be outside of this Court's control, the Court *does* have authority over the *length* and *type* of Mr. Magluta's punishment.   Under the very unique circumstances present here, which includes torturous conditions of confinement over several decades and their culmination in Mr. Magluta's recent and dramatic health declines, extraordinary and compelling circumstances are now present which warrant a sentence reduction.

As the Fourth Circuit recently explained, though it has long been known that solitary confinement has "serious psychiatric risks," research on special housing units in jails and prisons over "the last 15 years" has "advanced greatly," "furthering the scientific understanding of the

14

harmful effects of solitary confinement and social isolation." *Porter v. Clarke*, 923 F.3d 348, 356, 358 (4th Cir. 2019). These harms include: "psychotic-spectrum symptoms of paranoia and hallucinations; mood-spectrum symptoms of depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation; anxiety spectrum symptoms of subjective distress, feelings of impending doom, somatic complaints, dissociative experience, and ruminative thoughts; affective lability characterized by irritability, rage, and aggressive impulses; and behavioral self-control symptoms of aggression, assaults, and self-mutilation." *Id*. Put simply, solitary confinement "renders prisoners physically sick and mentally ill." *Id*. (citations omitted).

Indeed, recent neurological research has provided a biological basis for these findings—in ways relevant to Mr. Magluta's current health condition. As one expert recently explained, "[T]here are straightforward scientific explanations for the fact that solitary confinement—the absence of meaningful social contact and interaction with others—produces pain and suffering and can have harmful psychological consequences."[22] For example, the body's stress response to isolation produces higher cortisol levels, increasing blood pressure and inflammation; prolonged social isolation is associated with a 26 % increased risk of premature death.[23] The related chronic stress of prolonged isolation also damages the hippocampus of the brain, which controls "memory, spatial orientation, and emotional regulation," resulting in "memory loss, cognitive decline, and depression." *Id*.[24] "When sensory deprivation and absence of natural light are thrown into the mix," as in isolation units, "people can experience psychosis." *Id*. Indeed, as one psychologist testified at a congressional hearing, such an experience often leads prisoners into "a profound level of what might be called 'ontological insecurity.' . . . They are not sure that they exist and, if they do, exactly who they are."[25] Other experts have put it more bluntly—viewing solitary

---

[22] Craig Haney, *Restricting the Use of Solitary Confinement*, 1 Annual Review of Criminology 285, 286 (2018).

[23] Dana G. Smith, *Neuroscientists Make a Case against Solitary Confinement*, Scientific American (Nov. 9. 2018), at https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/.

[24] For obvious ethical reasons, empirical studies on the neurological impacts of extended solitary confinement have been limited. However, in one study of mice subjected to one month of social isolation, for example, "neurons in sensory and motor regions of the brain shrunk by 20 percent." Smith, *Neuroscientists Make a Case against Solitary Confinement*, Scientific American.

[25] Mark Binelli, Inside America's Toughest Federal Prison, N.Y. Times Magazine (Mar. 26, 2015), available at https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

confinement as "nothing less than a death penalty by social deprivation."[26]   Such cognitive changes are now apparent in Mr. Magluta.   As of July of 2019, in the most recent records available, his treating physician at BOP noted that Mr. Magluta showed an "insidiously deteriorated mental state" that was "chronically worsening," and that he had begun to exhibit "dementia-like symptoms."   BOP Medical Records, at 116.   Indeed, the changes were so marked as to raise concerns of "cerebral vascular disease," which affects the blood vessels and blood supply to the brain and can result in brain damage.

ADX provides a uniquely extreme example of solitary confinement practices, as the entire facility is operated as an isolation unit.   Inmates are confined alone to 12-by-7-foot concrete cells with a double set of sliding metal doors for almost 23 hours per day.[27]   Cells have a concrete bed, desk, and stool, with a combination sink and toilet; most cells also have an in-unit shower.[28]   Most cells are equipped with a radio and a black-and-white television with closed-circuit programming. *Id*.   Meals are provided through a slot in the door; at times, Mr. Magluta is permitted to pick up his meal tray himself from a nearby unit room.   Solitary recreational time in isolation, one and a half hours per day, involves being placed by guards into a slightly larger cell, the unit room, or an outdoor cage.   This is a place where "abstract dreams of rehabilitation have been entirely superseded by the architecture of control."   *Id*.   As former warden Robert Hood has described, "This place is not designed for humanity."   *Id*.

Perhaps most strikingly for this case, even though ADX is reserved for the most violent, highest risk inmates within the BOP system, the average length of stay at ADX is still only 3.8 years.[29]   And, given the extraordinarily harsh conditions of the facility and its destructive health effects, it is for good reason that most inmates are not designated there indefinitely.   Yet Mr. Magluta has now been confined at the facility for more than *ten years*—several times as long as most inmates there, even among those inmates considered to be special safety risks.   Indeed, he

---

[26] Dana G. Smith, Neuroscientists Make a Case against Solitary Confinement, Scientific American (Nov. 9. 2018), at https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/.

[27] Mark Binelli, Inside America's Toughest Federal Prison, N.Y. Times Magazine (Mar. 26, 2015), available at https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

[28] *See Cunningham v. Bureau of Prisons*, 12-cv-01570-RPM (D. Colo.), Second Amended Complaint (June 15, 2015), DE:274, at ¶ 31 (describing cell conditions).

[29] Office of the Inspector General, U.S. Dep't of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017), at 3, available at https://oig.justice.gov/reports/2017/e1705.pdf.

has been housed at ADX over this time even though, per BOP's own policies, individuals with "serious mental illness" like Mr. Magluta should not be placed there *at all*, given the serious health risks.[30]   As one psychologist recently explained, such placements are "especially problematic" because "mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain," and they are "more likely to deteriorate and decompensate when they are subjected to the harshness, stress, and deprivations of solitary confinement."[31]

This disparity goes to the heart of this motion.   The punishment to which Mr. Magluta has been subjected over these years has been brutal, painful, and dehumanizing.   As a result of such treatment, Mr. Magluta's health has been severely damaged, with rapid declines in his physical and mental condition.   Given these cognitive declines, he is now experiencing documented signs of dementia, and his grip on reality is slipping away.   Such circumstances are extraordinary and compelling.   And under such circumstances, continued incarceration becomes excessive, and inhumane.   The court *did not* sentence him to endure this kind of punishment.   *C.f. Davis v. Ayala*, 576 U.S. 257, 288 (2015) (Kennedy, J., concurring) ("Sentencing judges . . . devote considerable time and thought to their task.   There is no accepted mechanism, however, for them to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary.").

Yet the Court has the power to reduce his sentence, and change the quality of his punishment, at this time.   This is not to say that his punishment will end—even if his sentence is reduced to time served.   Much of the harms that he has endured carry long-term health consequences.   Further, Mr. Magluta respectfully requests that the Court impose a life term of home confinement, which remains punishment.   It would mean that he will remain on strict supervision and movement restrictions *for the rest of his life*.   But a reduction in sentence is the only means available to put a stop to a term of incarceration that, for a man in such a damaged state, is no longer serving a legitimate penological purpose.

## C. Mr. Magluta's vulnerability to Covid-19 is an additional extraordinary and compelling reason for a reduction in sentence.

In addition to the harms caused to him by prolonged solitary confinement, Mr. Magluta has further extraordinary and compelling reasons for release due to his vulnerability in this

---

[30]  *See* BOP Program Statement 5310.16, at 19.
[31]  Craig Haney, *Restricting the Use of Solitary Confinement*, 1 Annual Review of Criminology 285, 293–94 (2018).

pandemic.   Mr. Magluta, a 66-year-old man, has numerous serious medical conditions far exceeding most men of his years, including: kidney failure and Stage 3 chronic kidney disease, Type 2 diabetes mellitus, hypertension, hypothyroidism, hyperlipidemia, dysmetabolic syndrome x, obesity, ulcerative colitis, preglaucoma, pulpal necrosis and periapical abscess, temporomandibular joint disorder, dyspepsia, and major depressive disorder.   BOP Medical Records, at 99–100.   If he contracts Covid-19, several of these conditions put him at the highest and most severe risk of life-threatening complications or death.   As the World Health Organization explained in a recent report, "individuals at *highest risk* for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension, diabetes, cardiovascular disease, chronic respiratory disease and cancer."[32]   The WHO report was accompanied by sobering statistics outlining the historical mortality rates in China for those who contracted Covid-19 with specific comorbidities.   For those with diabetes, the fatality rate was 9.2 %; for those with hypertension, 8.4 %.[33]

The CDC has likewise warned that Covid-19 is especially dangerous for individuals with the same ailments from which Mr. Magluta suffers, including those with kidney disease, diabetes, obesity, hypertension, and neurologic conditions such as dementia, as well as for older adults.[34] Studies have also found that patients with *multiple* comorbidities have "greater disease severity" and poorer outcomes.[35]   As the CDC has explained, "The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[36]

These risks increase further for those who are incarcerated and unable to access adequate health care—and even more so for individuals incarcerated under conditions of solitary

---

[32]   Report of WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/ coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (fatality rates for patients with Covid-19 and comorbid conditions are: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

[33]   *Id*.

[34]   *See* CDC, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[35]   *See, e.g.*, Wei-jie Guan, et al., Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis; *Eur. Respir. J.*, (May 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC7098485/.

[36]   CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

confinement.   As one district court recently explained, the unique nature of the Covid-19 virus means that "close monitoring for a rapid decline in condition appears to be critical," and the failure to "provide immediate care if [an inmate's] condition suddenly declines could likely prove fatal." *U.S. v. McCall*, No. 2:18CR95-MHT, 2020 WL 2992197, at *5–6 (M.D. Ala. June 4, 2020) (granting compassionate release for Covid-19 positive inmate where BOP had failed to "correctly diagnose, monitor, and treat [defendant's] now life-threatening condition" and BOP doctors "appeared unconcerned about [the] delay" in providing treatment).   Yet isolation conditions at ADX make such close monitoring impossible.   At best, Mr. Magluta receives a short, daily status check, through the cell door, from staff conducting rounds.   At worst, the facility turns a blind eye to his medical needs.   Indeed, several years ago, he was forced to endure excruciatingly painful kidney stones *for more than a year after they were discovered by his doctor* before he was scheduled for a surgery for their removal.[37]   As a result of such delays, his kidney function greatly deteriorated, and remains permanently damaged.[38]   As noted above, he suffers from stage 3 chronic kidney disease today.

Even in the best of circumstances, jails and prisons are among the most dangerous places to be during an epidemic, as they create the ideal environment for transmission of contagious diseases.[39]   *See* Declaration of Dr. Jaimie Meyer, Assistant Professor of Medicine at Yale School of Medicine, attached as Exhibit B (explaining the particular risks of contagious diseases in prison

---

[37]   *See* BOP Medical Records, at 3–38; *Magluta v. Daniels, et al.*, 15-cv-2203, Fourth Amended Complaint, DE:87 (D. Colo. Jan. 17, 2017).

[38]   Such "haphazard and sometimes reckless" medical treatment is, unfortunately, not unique to Mr. Magluta; in past litigation against BOP regarding conditions at ADX, for example, plaintiffs alleged that the staff there "frequently make mistakes by distributing the incorrect medication to prisoners, or incorrect dosages of the correct medication."   *Cunningham v. Bureau of Prisons*, 12-cv-01570-RPM (D. Colo.), Second Amended Complaint (June 15, 2015), DE:274, at ¶ 74.

Indeed, as can be seen from his BOP medical records, Mr. Magluta himself has also had issues receiving correct dosages of prescribed medications.   In early 2019, for example, blood testing revealed "supratherapeutic" levels of amitriptyline, an antidepressant.   BOP Medical Records, at 95.   In another incident, due to an "oversight" by staff, his medication was "abruptly discontinu[ed]."   *Id*. at 64.

[39]   Matthew J. Akiyama, *et al.*, Flattening the Curve for Incarcerated populations – COVID-19 in Jails and Prisons, New England J. Med. (Apr. 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687 ("Therefore, we believe that we need to prepare now, by 'decarcerating,' or releasing, as many people as possible . . . . "); Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 8, 1047–55 (Oct. 15, 2007), https://doi.org/10.1086/521910.

both generally and for Covid-19).[40]   One district court recently aptly noted, "prisons are like tinderboxes for infectious disease."   *U.S. v. Rodriguez*, No. 2:03-CR-00271, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

As the Court is well aware, Covid-19 has been extremely difficult to control because it is so highly contagious.   The CDC advises that the coronavirus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs or sneezes."[41]   These droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about six feet of the infected person.[42]   And in environments like ADX, where inmates such as Mr. Magluta are shackled for out-of-cell movement, social distancing is impossible.   As Dr. Homer Venters, former chief medical officer of the New York City jail system, recently stated, "[T]he notion that germs won't spread if people are sealed in individual cells" could not be "farther from the truth." This is because "[l]ockdown units often require more staff than regular units, because of the need to handcuff and physically escort people to and from the shower, in and out of the cell for health care, and numerous other basic operations.   All of this means more staff and more physical contact."[43]   Reducing the use of lockdown units, writes Dr. Venters, is essential to "stave off preventable deaths and shorten the coronavirus outbreak" in prisons.   *Id.*

Indeed, those who are infected can spread the virus even if they are asymptomatic.[44]   The CDC now warns that as many as 25 % of people infected with the virus have no symptoms and may be "unwitting spreaders."[45]   As Dr. Jeffrey Shaman, an infectious disease expert at Columbia

---

[40]   This declaration was prepared in connection with another case and is attached here for informational purposes.

[41]   CDC, Coronavirus Disease 2019 (COVID-19), How It Spreads (Mar. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[42]   *Id.*

[43]   Homer Venters, *Coronavirus behind bars: 4 priorities to save the lives of prisoners*, The Hill (Mar. 23, 2020), *available at* https://thehill.com/opinion/criminal-justice/488802-coronavirus-behind-bars-4-priorities-to-save-the-lives-of-prisoners.

[44]   Marco Cascella, *et al.*, Features, Evaluation and Treatment Coronavirus (COVID-19), National Center for Biotechnology Information ("NCBI"), Mar. 20, 2020, https://www.ncbi.nlm.nih.gov/books/NBK554776/#_ncbi_dlg_citbx_NBK554776; Jane Qiu, *Covert coronavirus infections could be seeding new outbreaks*, Nature (March 20, 2020), https://go.nature.com/3bxZeUd.

[45]   Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Apr. 1, 2020), https://www.nytimes.com/2020/03/31/ health/coronavirus-asymptomatic-transmission.html.

University, explains: "The bottom line is that there are people out there shedding the virus who don't know that they're infected."[46]   Thus, BOP is unable to accurately identify who has Covid-19 and who does not, including among its own staff.   As such, the agency can do little more than screen for symptomatic coronavirus carriers, mask and isolate any they find, and bar unnecessary visitors—which is precisely what they are doing.[47]   Yet given the nature of Covid-19, this type of screening is woefully inadequate.   Symptoms do not appear for "2–14 days after exposure," according to the CDC,[48] with a median incubation period of 5.1 days[49]—meaning that inmates and guards will continue to interact almost a week before detection is even possible.[50] Alarmingly, recent reporting confirms that staff at the BOP facility at Oakdale were told to report to work, even if they had exposure to individuals who tested positive for Covid-19, as long as they were not symptomatic.[51]   Likewise, a union representing 30,000 BOP employees recently filed an OSHA complaint citing the "imminent danger" of conditions at BOP facilities nationwide.[52]   The complaint alleges that BOP has directed staff members to return to work within 48 hours of being in close proximity to those with coronavirus or symptoms of the virus; authorized the movement of inmates with suspected or confirmed coronavirus cases to areas nationwide that did not have any known infections; failed to mitigate the spread of Covid-19 in facilities by using air filters or improving ventilation in other ways; failed to maintain social distancing guidelines for inmates and staff; and failed to provide necessary PPE to staff interacting with hospitalized inmates.[53]

---

[46] *Id.*

[47] *See BOP Implementing Modified Operations*, https://bit.ly/2XzmsFt.

[48] CDC, *Coronavirus Disease, Symptoms* (Feb. 29, 2020), https://bit.ly/3bumnqt.

[49] Stephen A. Lauer, Ph.D., *The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application*, Annals of Internal Med. (Mar. 10, 2020) (abstract), https://bit.ly/2XztWbU.

[50] *See generally* Pien Huang, *Can A Coronavirus Patient Who Isn't Showing Symptoms Infect Others?*, Nat'l Pub. Radio (Apr. 13, 2020), https://n.pr/2VoAirL. According to Shweta Bansal, Ph.D., an infectious disease expert at Georgetown University, the evidences shows "that SARS-CoV-2 has this ability to spread silently."

[51] Joseph Neff & Keri Blakinger, *Federal Prison Ageny "Put Staff in Harm's Way" of Coronavirus:  Orders at Oakdale in Louisiana Help Explain COVID-19 Spread*, MARSHALL PROJECT, Apr. 3, 2020, https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

[52] *See* OSHA complaint filed by Shane Fausey, president of Council of Prison Locals 33, on March 31, 2020, attached as Exhibit C.

[53] *Id.*; *see also* Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities* (Apr. 7, 2020), https://bit.ly/3a5r3C9.

Further, it is now well known that Covid-19 spreads through aerosol transmission, and that these risks are exacerbated in poorly ventilated buildings and in buildings with older HVAC systems—like prisons. *See* CDC, Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission (Oct. 5, 2020) (explaining that airborne transmission is exacerbated in "enclosed spaces" with "inadequate ventilation").[54] One recent study of the San Quentin State Prison in California documented the virus's rapid spread there, finding that the facility's poor ventilation system created "high-risk for a catastrophic super spreader event," and recommending that its HVAC units be cleaned "immediately" and better used to "maximize air exchange."[55] Given such concerns, Mr. Magluta remains vulnerable to contracting Covid-19 *even while he remains in solitary confinement*, from close contact with guards and while moving throughout the facility. All three institutions, including the ADX, have recently experienced a significant increase in Covid-19 infections; inmates and staff are infected at the ADX. *See* www.bop.gov/coronavirus/

Under the framework of the Guidelines, these compounding risks mean that Mr. Magluta's ability to "provide self-care" within his prison environment, in light of the threat posed by the virus while incarcerated and given his debilitated medical and mental health conditions, is now "substantially diminished." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). These are "extraordinary and compelling" reasons for release. *Id.* Indeed, "[n]o rationale is more compelling or extraordinary." *U.S. v. Foster*, No. 1:14-cr-324-02, DE:191, at 10 (M.D. Pa. Apr. 3, 2020).

In fact, internal Department of Justice policies acknowledge that extraordinary and compelling reasons exist under the circumstances presented in this case. In May 2020, the DOJ issued new guidance "conced[ing] that Defendants who have certain CDC risk factors . . . can establish that 'extraordinary and compelling reasons' warrant the reduction in sentence." *See Firebaugh*, 16-cr-20341-UU, Government's Supplemental Response (D.E. 43) (S.D. Fla. June 1, 2020).[56] This guidance was updated in August, after CDC guidelines shifted to include obesity

---

[54] https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html

[55] AMEND: COVID in California Prisons Program and Berkeley Public Health, *Urgent Memo, COVID-19 Outbreak: San Quentin Prison,* (June 15, 2020), available at: https://amend.us/wp-content/uploads/2020/06/COVID19-Outbreak-SQ-Prison-6.15.2020.pdf

[56] DOJ internal guidance now directs the government to "concede that Defendants who have certain CDC risk factors, including:

1. Asthma (moderate to severe)
2. Chronic kidney disease being treated with dialysis
3. Chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis
4. Diabetes, including type 1, type 2, or gestational

(defined as BMI above 30) as an extraordinary and compelling circumstance warranting a sentence reduction.[57]   Mr. Magluta has *three* of the high-risk factors identified by the DOJ: chronic kidney disease, diabetes, and obesity.   Thus, per DOJ's recent policy, extraordinary and compelling reasons have been established in Mr. Magluta's case to warrant a reduction in sentence here.

By granting Mr. Magluta's motion, this Court would not tread new ground.   Numerous courts nationwide have highlighted the same conditions that Mr. Magluta suffers from as a basis for release, when combined with the threat of Covid-19.   For representative lists of cases, this

---

5.   Hemoglobin disorders, such as sickle cell disease and thalassemia
6.   Immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications
7.   Liver disease, including cirrhosis
8.   Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and/or
9.   Severe obesity, defined as a body mass index (BMI) of 40 or above

can establish that 'extraordinary and compelling reasons' warrant the reduction in sentence." *United States v. Firebaugh*, 16-cr-20341-UU, Government's Supplemental Response (DE 43) (S.D. Fla. June 1, 2020); *see United States v. Feucht*, 11-cr-60025-DMM, Government's Response, DE 51 (S.D. Fla. May 26, 2020) ("Pursuant to policy directives of the Attorney General, the Government agrees that the defendant's serious medical condition (diabetes) presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement.   The Centers for Disease Control and Prevention ('CDC') has identified risk factors that place individuals at higher risk of severe outcomes from COVID-19. The Government acknowledges that during the current COVID-19 pandemic, an inmate who presents one of the CDC risk factors, which include diabetes, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release."); *see also United States v. Wright*, 8:17-cr-00388-TDC, Government's Supplemental Response, DE:50 (D.Md. May 19, 2020) (explaining that per DOJ guidance, "the Government concedes that the defendant's Type I diabetes, and perhaps other of her medical conditions, constitute 'extraordinary and compelling circumstance' during the current pandemic, even if these conditions in ordinary times would not allow compassionate release").

[57]   *See* Government's Letter (DE 95), *United States v. Cole*, 18-cr-167, (D. Md. July 30, 2020) (explaining that the government had "received guidance from the Department of Justice interpreting the updated CDC guidance . . . [which] broadened the definition of some of the conditions the CDC states are risk factors, including obesity," and "conced[ing] that Defendant's body mass index (BMI) above 30 constitutes an extraordinary and compelling reason warranting a reduction sentence").

includes numerous grants of compassionate release for individuals with kidney disease,[58] individuals with diabetes,[59] and individuals who suffer from obesity.[60]

[58] *See, e.g.*, *United States v. Howard*, 2020 WL 2200855 (E.D.N.C. May 6, 2020); *United States v. Norris*, 2020 WL 2110640 (E.D.N.C. Apr. 30, 2020); *United States v. Saad*, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020); *United States v. Bertrand*, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Musumeci*, 1:07-cr-00402-RMB-1, Dkt. No. 58 (S.D.N.Y. Apr. 28, 2020); *United States v. Sanchez*, 1:95-cr-00421-MGC-1, Dkt. No. 290 (S.D. Fla. Apr. 27, 2020); *United States v. Williams*, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Jackson*, 2020 WL 1955402 (S.D. Tex. Apr. 23, 2020).

[59] *See, e.g.*, *United States v. Mattingly*, 2020 WL 2499707 (W.D. Va. May 14, 2020); *United States v. Lopez*, 2020 WL 2489746 (D. N.M. May 14, 2020); *United States v. Barber*, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Rivernider*, WL 2393959 (D. Conn. May 12, 2020); *United States v. Hunt*, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ramirez*, 2020 WL 2402858 (D. Mass. May 12, 2020); *United States v. Al-Jumail*, 2020 WL 2395224 (E.D. Mich. May 12, 2020); *United States v. Simpson*, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Reddy*, 2020 WL 2320093 (E.D. Mich. May 11, 2020); *United States v. Connell*, 2020 WL 2315858 (N.D. Cal. May 8, 2020); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Quintero*, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Pabon* 2020 WL 2112265 (E.D. Penn. May 4, 2020); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Rivera*, 2020 WL 2094094 (S.D. N.Y. May 1, 2020); *United States v. Pinkerton*, 2020 WL 2083968 (C.D. Ill. Apr. 30, 2020); *United States v. Saad*, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020); *United States v. Lucas*, 2020 WL 2059735 (W.D.N.Y. Apr. 29, 2020); *United States v. Bertrand*, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Musumeci*, 1:07-cr-00402-RMB-1, Dkt. No. 58 (S.D. N.Y. Apr. 28, 2020); *United States v. Sanchez*, 1:95-cr-00421-MGC-1, Dkt. No. 290 (S.D. Fla. Apr. 27, 2020); *United States v. Dillard*, 1:15-cr-170- SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Coles*, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020); *United States v. Tillman*, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020); *United States v. Logan*, 1:12-cr-00307-LEK-1, Dkt. No. 179 (N.D. N.Y. Apr. 22, 2020); *United States v. Bess*, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020); *United States v. Suarez*, 1:18-cr-20175-MGC-1, Dkt. No. 180 (S.D. Fla. Apr. 20, 2020); *United States v. Samy*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020); *United States v. Trent*, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Hansen*, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020); *United States v. Winckler*, 2020 WL 1666652 (W.D. Penn. Apr. 3, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020); *United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. Mar. 31, 2020); *United States v. Harpine*, 6:91-cr-60156-MC-1, Dkt. No. 221 (D. Or. Mar. 27, 2020)

[60] *United States v. Handy*, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, 2020 WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, 2020 WL 2175171 (W.D.

**D. Converting Mr. Magluta's sentence to a lifetime term of home confinement is sufficient to accomplish the goals of sentencing.**

Once extraordinary and compelling reasons are established, the Court must then consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted.   18 U.S.C. § 3582(c)(1)(A).   Under the unique circumstances of this case, converting Mr. Magluta's sentence to a lifetime term of home confinement, in combination with the rehabilitation that he has already undergone and the extraordinarily harsh conditions in which he has served his sentence to date, is now sufficient to satisfy the purposes of sentencing.   Further, Mr. Magluta today is in a profoundly deteriorated mental state, with symptoms of dementia and brain dysfunction.   Given this background, he plainly does not pose any danger to the safety of any other person or the community.

**a. The § 3553(a) factors support Mr. Magluta's release under these extraordinary circumstances, and his continued incarceration is greater than necessary to accomplish the goals of sentencing.**

Mr. Magluta has now served more than two decades in prison on this case.   For most of the time he has been incarcerated, he has been in solitary confinement, under conditions that are considered by the U.N. to be "a "form of torture."[61]   His own physical and mental health has recently taken a dramatic downswing, consequences that are in line with widely accepted scientific research showing such treatment to be both extraordinarily psychologically painful and causing serious physical harms to those subjected to it.   When considering the need for a sentence imposed by the Court to "provide just punishment for the offense," as required by § 3553(a)(2)(A), the punishment Mr. Magluta has already endured over these years is more than sufficient to meet the purposes of that statute.

The Court has found that Mr. Magluta's crimes were extremely serious.   Mr. Magluta today fully acknowledges this truth and is extremely remorseful for all of his conduct.   He

---

N.Y. May 6, 2020); *United States v. Howard*, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Delgado*, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); *United States v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Joling*, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Trent*, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

[61]   United Nations Commission on Human Rights, Report by Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment (Mar. 20, 2020), U.N. Doc. A/HRC/43/49, https://www.ohchr.org/en/issues/torture/srtorture/pages/srtortureindex.aspx.

recognizes the pain he has caused.   He has spent many years seeking forgiveness for his actions, primarily through his Christian faith and religious studies.   Today, he accepts full responsibility for the entirety of the charges against him, and he continues today to make amends for his past wrongdoing. It is worth emphasizing that Mr. Magluta's request for a sentence reduction is in no way an attempt to minimize his conduct in this case or in prior cases.   It is, rather, a sincere request for the Court to consider whether—given his declining health and the extremely brutal treatment to which he has been subjected over these years—the balance of "just punishment" has now shifted, and can be attained by non-incarceratory means.   Further incarceration under these circumstances is excessive.

Indeed, many courts have recognized that "provid[ing] just punishment for the offense" means that, under § 3553(a)(2)(A), the *quality* of punishment is just as relevant as its *quantity*. The decline of his health and the harsh conditions of his incarceration over these decades means that Mr. Magluta has served his sentence "while seriously ill and in physical discomfort." *U.S. v. Williams*, No. 3:04-CR-95, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020).   "This means that his sentence has been significantly more laborious than that served by most inmates.   It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)." *Id*. (citations omitted) (granting compassionate release and reducing life sentence to time served).   And such circumstances can merit a sentence reduction.   *See, e.g.*, *U.S. v. Beck*, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019) (granting compassionate release and reducing sentence to time served, given the defendant's medical condition "and the poor treatment she has received at BoP," because now "a longer sentence would be greater than necessary to serve [the] purposes" of § 3553(a)(2)).

Further, the traumas caused by the punishment that Mr. Magluta has endured in solitary confinement for many years will continue—even if he is released from such incarceration by this Court and permitted to continue his sentence on home confinement.   This lingering harm is another form of punishment, too.   Solitary confinement is known to have long-term health effects that haunt those subjected to it.   As the Fourth Circuit recently explained, "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019).   The Third Circuit, too, recently reviewed the "robust body of scientific research on the effects of solitary confinement" and found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at

risk of long-term . . . damage." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017). Experts believe that those who experience such forms of punishment are "punished for life,"[62] as such experiences cause "irreparable psychological and physical consequences."[63] Mr. Magluta's many chronic and compounding health issues today provide a stark illustration of this phenomenon.

Releasing him to home confinement at this time, given the years of punishment he has endured in these conditions, does not undermine the seriousness of his offenses. Indeed, Mr. Magluta's long-term partner in his offenses, Augusto Falcon, was released from custody several years ago, in 2017, at the end of his 20-year sentence imposed by the Court. Section 3553(a)(6) requires the Court to consider similarly culpable defendant and avoid unwarranted sentencing disparities. Given their relative culpability, Mr. Magluta's release to home confinement at this time, under these circumstances, is consistent with § 3553(a)'s mandate. Further, the harshness of the sentence which Mr. Magluta has already served, and the length of the sentence he has already served even as compared to Mr. Falcon, would also continue to promote respect for the law. Nor is further incarceration necessary for deterrence. Perhaps most importantly, Mr. Magluta is sincerely repentant for the conduct that led to this case, and he has no desire to return to his prior lifestyle; these many years in prison have taught him that, many times over. But he is not only unwilling, and unlikely, to repeat such conduct today; his rapidly declining physical and mental health means that he is also incapable of doing so. Mr. Magluta is in extremely poor health and experiencing symptoms of dementia. Simply put, he is not able to resume the lifestyle that brought him to this punishment.

Mr. Magluta thus respectfully asks this Court to release him to a lifetime term of strict home confinement. Home confinement is not prison, but it is "a serious restriction of liberty" nevertheless. *Ilchuk v. Attorney General*, 434 F.3d 618, 623 (3d Cir. 2006); *see also Chopra*, 18-cr-20668-DMM, DE:606, at 10 (S.D. Fla. June 8, 2020) (explaining that home confinement "*is a punishment*"). The Supreme Court, too, recognizes that imposing such release terms is not an act of "leniency." *See Gall v. U.S.*, 552 U.S. 38, 44, 48 (2007) (supervisees do "not enjoy the absolute liberty to which every citizen is entitled," and terms of release are no "act of leniency"

---

[62] Erica Goode, *Solitary Confinement: Punished for Life*, N.Y. TIMES (Aug. 3, 2015), available at https://nyti.ms/1HmwM0f.

[63] Office of the United Nations High Commissioner for Human Rights, *United States: prolonged solitary confinement amounts to psychological torture, says UN expert* (Feb. 28, 2020), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25633&LangID=E.

but a "substantial restriction of freedom" in which defendant would "always face the harsh consequences that await if he violates").

Home confinement ensures measures to recover from decades of isolation and to protect the further deterioration of his health, while he continues to be punished for his offense.   As other courts have recognized, lifetime supervised release conditions will "serve as a sanction and general deterrent, appropriately recognizing the seriousness" of the types of conduct at issue in this case.   *U.S. v. McGraw*, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019).   But further *incarceration* is not needed to deter Mr. Magluta from future offenses or protect the public from future crimes.   Thus, Mr. Magluta respectfully asks the Court to consider that option here.  Given the torturous punishments that Mr. Magluta has now suffered for decades, the cumulative sentence he will have received even if his sentence is converted to home confinement at this time is sufficient, and it will continue to serve the purposes of punishment under § 3553(a)(2).

Under *Pepper v. United States*, 562 U.S. 476, 490–93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).   And even in light of the sentence that this Court originally imposed, the purposes of just punishment do not warrant a sentence to decades of confinement in extreme isolation, with the catastrophic loss of self and reality as has taken place here.   Indeed, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody.   *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions").

Notably, the Eighth Amendment also guarantees inmates in BOP custody the right to adequate medical care for a serious medical need.   *See Farmer v. Brennan*, 51 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976).   As such, one court recently invoked the Eighth Amendment in granting a motion for compassionate release, noting that "a reduction of [defendant's] sentence will enable him to seek, from the doctors and hospitals of his choice, what may be better medical care than the BOP is obligated or able to provide, particularly given the very real threat that COVID-19 poses in the institutional environment."   *U.S. v. Williams*, No. 3:04-CR-95, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020).

**b.  Mr. Magluta is no longer a danger to the community.**

Finally, Mr. Magluta does not pose any danger to the community today.   First, he is profoundly remorseful for his previous conduct, and he has worked hard towards his rehabilitation

while in custody.   To the extent that he has been able during his term of incarceration, given the atypical conditions of his confinement within the BOP system, Mr. Magluta has attempted to make good on his promises and to demonstrate both his remorse and his rehabilitation.   He has, for example, completed dozens of courses of programming that has been available to him, both at ADX and at prior facilities.   *See* BOP Progress Report, at 1–3.[64]   At USP Terre Haute, for example, he participated in and completed the Challenge program, a cognitive-behavioral treatment program; prior to that, at USP Marion, he completed the Enhanced-Challenge, Opportunity, Discipline, and Ethics (E-CODE) treatment program.   *Id*. at 5.   At ADX, he participates in the limited programming available through the BOP's closed-circuit televisions. *Id*. at 1–3.   He also continues to correspond with his Miami-based church, diligently following their monthly courses of Bible study even to this day.   Mr. Magluta is no longer the same person that he was years ago—both because he has been severely damaged by his time in custody, but also because he has learned from it.   And he continues to be an engaged member of his faith community in an effort to make amends.

He has also maintained strong ties with his family, and he is extremely fortunate to continue to have their love and support.   If released to home confinement, he would live with his mother at the same home that she has lived in for almost 40 years.   His mother is now advanced in age, and she requires assistance.   Thus, Mr. Magluta's son Christian, along with his wife and three children, recently moved in with their grandmother to help her around the house.   Mr. Magluta's son works full-time at a transportation and logistics company, and his daughter-in-law is a school administrator.   He has also remained close to his cousin, Jorge, who is part of the senior management team at an automotive dealer in Orlando.   That same family structure would be able to assist Mr. Magluta as he manages a transition away from confinement.

Any individual returning from extended isolation will require specialized care to assist in the transition to normal life.   *See* Dr. Brie A. Williams, *Older Prisoners and the Physical Health Effects of Solitary Confinement*, 106 Am. J. Public Health 2126 (Dec. 2016) (citing the case of Albert Woodfox, who was recently released after several decades of solitary confinement at Louisiana's Angola prison, as he would "face extraordinary challenges as he rebuilds his body and

---

[64]   The most recent BOP Progress Report provided to Mr. Magluta, noting his programming and disciplinary history, is submitted here as Exhibit D (dated July 28, 2020).   This copy was provided to counsel by Mr. Magluta, as BOP has not fulfilled any of counsel's repeated requests for such records.

soul after an unimaginable physical and psychological ordeal").   Mr. Magluta's family is committed to help him in this effort, if provided the opportunity by this Court.

Over these many years, Mr. Magluta's disciplinary history in custody has been minimal. He did commit a serious infraction in 2013, when two cell phones were found in a cell that he shared with another inmate.   *See* BOP Progress Report, at 4.[65]   Mr. Magluta takes full responsibility for his conduct in that incident, and he does not attempt to minimize it.   But, even though this was a serious infraction, it was not violent in any way.   Nor should such an offense be enough to justify continued incarceration under such conditions.   Indeed, in another recent case granting compassionate release—one where the defendant was found to have committed "possession of a cell phone in 2017" while in custody, among other infractions, the court determined that the infraction was "not violent in nature," and proceeded to reduce the defendant's sentence of 385 months to time served.   *U.S. v. Adeyemi*, No. CR 06-124, 2020 WL 3642478, at *3 (E.D. Pa. July 6, 2020) (granting compassionate release for defendant convicted of multiple armed robberies).   Other than that incident, in the past twenty years, Mr. Magluta has only had extremely minor issues.   In 2017, he was cited for keeping extra postage stamps in his cell.   BOP Progress Report, at 4.[66]   More recently, in 2019, Mr. Magluta has received a series of write-ups related to issues with his medications and mental health—similar to the incident described above, where he attempted to eat a bag of pills.   *Id*.   More than anything, such conduct reflects his deteriorating mental state, not any lingering danger.

Nor does the seriousness of the crimes of conviction, on their own, mean that Mr. Magluta is not deserving of a grant of compassion under these extraordinary circumstances.   As noted above, other courts have recently granted compassionate release to defendants who, at one time, were leaders of large drug organizations.   *See, e.g.*, *U.S. v. Bernard*, DE:1811, 97-cr-48-RNC (D. Conn. Aug. 4, 2020) (granting compassionate release and reducing 405-month sentence to time served for defendant who was the "head of the Latin Kings in Connecticut" and the "lead defendant in a large RICO conspiracy case" involving that group, when defendant was 57 years old and "at 'high risk' of serious illness or death were he to contract COVID-19").   In fact, many courts have also granted compassionate release to defendants serving life sentences even when convicted of

---

[65] Note that possessing a cellular phone is classified by BOP in its report as "possessing a hazardous tool."

[66] This incident with the postage stamps is reflected in the BOP Progress Report as "possessing unauthorized money."

violent crimes—including this Court.   *See U.S. v. Rice*, 90-cr-0768-PAS, DE:421 (S.D. Fla. June 8, 2020) (reducing life sentence to time served for defendant convicted of drug, weapon, and assault charges); *see also U.S. v. Diego Rodriguez*, 2020 WL 5810161, at *1 (S.D.N.Y. Sept. 30, 2020) (granting compassionate release and reducing life sentence to 30 years for defendant convicted of racketeering, drug trafficking, and "brutal murder of a government informant").

At this time, and as Mr. Magluta approaches his 70s in his deteriorated physical and mental state, the Court can be assured that conditions exist to "reasonably assure . . . the safety of any other person and the community" if he were released.   *U.S. v. McGraw*, 2019 WL 2059488, at *4 (S.D. Ind. May 9, 2019) (granting compassionate release where "the seriousness of [defendant's] offense and criminal history are wholly outweighed by [defendant's] serious, deteriorating conditions").   For example, the Court can "order an updated version of the conditions of supervised release to ensure" that Mr. Magluta "does not have contact with those engaging in criminal activity."   *Id*.   And as Mr. Magluta has requested, the Court can order that he be placed on home confinement conditions for the rest of his life.   "With probation's oversight," such conditions "ensure the protection of the public."   *Id*.   Indeed, as this Court recently observed in another case, "Home confinement provides [the defendant] the opportunity to continue his positive behavior in prison and demonstrate that he can make the right choices, on a daily basis, to be a law-abiding citizen."   *U.S. v. Rice*, 90-cr-0768-PAS, DE:421 (S.D. Fla. June 8, 2020).

"This is an unprecedented time in our nation's history, filled with uncertainty, fear, and anxiety," and it is in times like this that courts must exercise "compassion."   *Castillo v. Barr, et al.*, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020).   Given the brutal nature of his confinement to date and the damages that it has wrought, and in light of the serious risks to his physical and mental health posed by continued incarceration, Mr. Magluta respectfully asks the Court to consider such a grant here.

Undersigned counsel has reached out to AUSA Michael Davis regarding this motion, and he advises that the government opposes relief.

### *Conclusion*

Under these extraordinary circumstances, Mr. Magluta respectfully requests that the Court grant his request for compassionate release, reduce his sentence, and impose a life term of supervised release with home confinement.

Respectfully Submitted,

/s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Fla. Bar No. 305294
Richard C. Klugh, P.A.
Counsel for Defendant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Telephone:   305/536-1191
Facsimile: 305/536-2170
rklugh@klughlaw.com